SLIP OPINION

Cite as 2015 Ark. 360

# SUPREME COURT OF ARKANSAS

No. CV-14-848

| | |
|---|---|
| TOWN OF LEAD HILL, ARKANSAS, ET AL. <br><br> APPELLANTS <br><br> V. <br><br><br> OZARK MOUNTAIN REGIONAL PUBLIC WATER AUTHORITY OF THE STATE OF ARKANSAS <br> APPELLEE | Opinion Delivered October 8, 2015 <br><br> APPEAL FROM THE BOONE COUNTY CIRCUIT COURT [NO. CV-2013-207-1] <br><br> HONORABLE SHAWN A. WOMACK, JUDGE <br><br> AFFIRMED. |

KAREN R. BAKER, Associate Justice

This appeal stems from a Wholesale Water Purchase Contract ("contract") between appellants, Town of Lead Hill, Arkansas, et al. ("Lead Hill") and the appellee, Ozark Mountain Regional Public Water Authority ("Ozark"). On April 27, 2009, the parties entered into a contract with a forty-year term for Ozark to provide potable water to Lead Hill. Lead Hill agreed to purchase water with a "minimum monthly charge" based on an average daily usage of 56,038 gallons at the rate between $2.75 and $3.25 per thousand gallons at a minimum monthly charge between $4,687 and $5,540. Further, the contract provided that Lead Hill would pay the minimum monthly charge regardless of whether Lead Hill "actually purchased or takes water" from Ozark. Ozark constructed a water-treatment facility and connecting water lines and incurred bond indebtedness secured in part by the contract. The contract provided that water would be provided commencing in November 2012.

On November 12, 2012, Ozark began supplying potable water to Lead Hill, and Lead Hill paid for the water. On August 16, and September 16, 2013, Ozark sent Lead Hill monthly invoices. The invoices totaled $10,555.02, which included a late fee of $51.99. However, Lead Hill did not pay those invoices. On October 15, 2013, Lead Hill notified Ozark that the Lead Hill City Council had unanimously voted to terminate its contract with Ozark.

On October 25, 2013, Ozark filed suit against Lead Hill seeking a declaratory judgment and a writ of mandamus to enforce the contract. On November 27, 2013, Lead Hill filed an answer. On January 15, 2014, Ozark filed a motion for summary judgment and brief in support. Lead Hill responded and filed an amended response, and Ozark replied.

On March 13, 2014, the circuit court held a hearing and, at the request of the parties, entered a continuance in the matter and delayed ruling on the motion for summary judgment for sixty days while the parties attempted to resolve the matter and Lead Hill was to make payments into the registry of the circuit court. On May 22, 2014, the circuit court conducted a hearing on the summary-judgment motion. On June 11, 2014, the circuit court granted Ozark's motion for summary judgment and issued a writ of mandamus. On July 9, 2014, Lead Hill timely filed its notice of appeal and now presents four points on appeal: (1) the contract violates article 12, section 4, and amendment 78 of the Arkansas Constitution; (2) the contract violates federal law; (3) Ozark lacked the capacity to enter into the contract; and (4) the contract is unenforceable under several contract principles. Because this case presents an issue involving the interpretation of the Arkansas Constitution, we have

jurisdiction pursuant to Ark. Sup. Ct. R. 1–2(a)(1) (2014).

*Standard of Review*

This case comes to us from an order granting summary judgment. A trial court may grant summary judgment only when it is apparent that no genuine issues of material fact exist requiring litigation and that the moving party is entitled to judgment as a matter of law. *Crockett v. C.A.G. Invs., Inc.*, 2011 Ark. 208, 381 S.W.3d 793. Summary judgment is not proper, however, where evidence, although in no material dispute as to actuality, reveals aspects from which inconsistent hypothesis might reasonably be drawn and reasonable minds might differ. *Thomas v. Sessions*, 307 Ark. 203, 818 S.W.2d 940 (1991). In *Flentje v. First Nat. Bank of Wynne*, 340 Ark. 563, 569-70, 11 S.W.3d 531, 536 (2000) (internal citations omitted), we explained, "we only approve the granting of the motion when the state of the evidence as portrayed by the pleadings, affidavits, discovery responses, and admission on file is such that the nonmoving party is not entitled to a day in court, i.e., when there is not any genuine remaining issue of fact and the moving party is entitled to judgment as a matter of law. However, when there is no material dispute as to the facts, the court will determine whether reasonable minds could draw reasonable inconsistent hypotheses to render summary judgment inappropriate."

On appeal, we view the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Harrisburg Sch. Dist. No. 6 v. Neal*, 2011 Ark. 233, 381 S.W.3d 811.

*Points on Appeal*

SLIP OPINION

I. *Article 12, Section 4, and Amendment 78 of the Arkansas Constitution*

A. Article 12, Section 4

Turning to Lead Hill's first point on appeal, Lead Hill asserts that the circuit court erred in granting summary judgment regarding two provisions of the Arkansas Constitution, article 12, section 4, and amendment 78. Prior to reaching this issue, we note that when interpreting the constitution, "our task is to read the laws as they are written, and interpret them in accordance with established principles of constitutional construction. . . . Language of a constitutional provision that is plain and unambiguous must be given its obvious and common meaning." *Smith v. Sidney Moncrief Pontiac, Buick, GMC Co.*, 353 Ark. 701, 720, 120 S.W.3d 525, 537 (2003) (internal citations omitted).

First, at issue is article 12, section 4, of the Arkansas Constitution, which provides in pertinent part,

> The fiscal affairs of counties, cities and incorporated towns shall be conducted on a sound financial basis, and no county court or levying board or agent of any county shall make or authorize any contract or make any allowance for any purpose whatsoever in excess of the revenue from all sources for the fiscal year in which said contract or allowance is made[.]

In other words, a city cannot enter into a contract for an amount that exceeds its annual revenue for a fiscal year. Here, the circuit court held that article 12, section 4 was not a valid legal defense to enforcement of the contract.

Article C, section 19, of the contract provides as follows:

> Funding of Purchaser:
>
> The parties hereto agree that all Purchaser revenues associated with the funding of this Agreement shall be derived solely from revenues generated by

the sale of the Purchaser's water to its customers and that except for a pledge of said revenues that Purchaser does not otherwise further guarantee the obligations hereunder with its full faith and credit.

On appeal, Lead Hill asserts that the contract violates article 12, section 4, and the contract is void and unenforceable because the contract exceeded Lead Hill's annual revenue. Lead Hill further contends that although the provision of the contract may purport to limit the payments only from income derived from the sale of water by Lead Hill to its waterworks customers, its customer base has been reduced by fifty percent and therefore its financial obligation under the contract also exceeds its annual revenue for one year because of its loss of customers. Therefore, Lead Hill argues that the terms of the contract are not enforceable under article 12, section 4.

Ozark responds that the contract language is clear – the funding for the contract is derived solely from the revenues generated by the sale of the water to its customers. Ozark further contends that Lead Hill's arguments regarding loss of its customers is hearsay and not part of the record. Relying on *McGehee v. Williams*, 191 Ark. 643, 87 S.W.2d 46 (1935), and *Hink v. Board of Directors of Beaver Water District*, 235 Ark. 107, 357 S.W.2d 271 (1962), Ozark contends that we have affirmed the authority of towns such as Lead Hill to purchase water pursuant to multiyear contracts, and the circuit court properly granted summary judgment in its favor.

In *McGehee*, we held that the town of Alma's twenty-year–purchase contract did not violate article 12, section 4, also known as amendment 10, because the payments due under the contract were revenues solely from Alma's sale of water to its customers and would not

constitute a guarantee of Alma's full faith and credit:

> Appellants also contend that this contract is in violation of Amendment No. 10 to the Constitution of 1874. This contention is grounded upon the theory that the water rentals due under the contract would be a charge against the general revenues of the city of Alma during the life of the contract. We do not so construe the contract. The rentals therein provided are to be paid from the revenue derived from the distribution of the water supply. When the contract is thus construed, it can in no event offend the amendment.

*McGehee*, 191 Ark. 643,649, 87 S.W.2d 46, 48 (1935).

> Next, in *Hink*, we also interpreted article 12, section 4, and explained,

> Amendment 10 requires the fiscal affairs of all cities to be conducted on a sound financial basis and prohibits any city from entering into any contract or incurring any obligation in excess of its revenues for the current fiscal year. By one of the contracts now in question, attached as Exhibit C to the complaint, the city would pledge only its net waterworks revenues to secure the performance of its contract with the Beaver Water District. This contract is valid, for it is well settled that Amendment 10 does not prohibit the creation of a debt exceeding current annual revenues if the debt is secured by and payable solely out of the income or assets of a special and separable activity such as a municipal waterworks. *Williams v. Harris*, 215 Ark. 928, 224 S.W.2d 9.

*Hink*, 235 Ark. at 110, 357 S.W.2d at 273.

In *McGehee* and *Hink*, we held that multiyear purchase contracts for water did not violate article 12, section 4 because the contracts did not pledge the full faith and credit of the town; but rather they pledged the revenues derived from the sale of the water and pledged the revenues of its own waterworks system. Here, the same is true. The contract at issue provides,

> The parties hereto agree that all Purchaser revenues associated with the funding of this Agreement shall be derived solely from revenues generated by the sale of the Purchaser's water to its customers and that except for a pledge of said revenues that Purchaser does not otherwise further guarantee the obligations hereunder with its full faith and credit.

Accordingly, *McGehee* and *Hink* are on point, and we do not find merit in Lead Hill's argument. Based on the express terms of the contract and the record before us, Lead Hill has pledged payment under the contract "solely from revenues generated by the sale of the [Lead Hill's] water to its customers and that except for a pledge of said revenues that [Lead Hill] does not otherwise further guarantee the obligations hereunder with its full faith and credit."

Further, as Lead Hill has argued in its brief, the crux of Lead Hill's argument here is the "practical effect" of the enforcement. Our review is of the circuit court's order concerning the terms of the contract, not any future enforcement of the contract. Here, the language of the contract does not offend art. 12, section 4. Finally, in support of its position, Lead Hill references a contempt order and a sales-and-use tax that Lead Hill alleges was passed as a result of the contempt order. However, Lead Hill did not appeal from the contempt order.

We hold that Lead Hill has failed to show that there is a genuine issue as to a material fact or that reasonable differing inferences could be drawn from the undisputed facts. Accordingly, we affirm on this first point.[1]

---

[1]Justice Danielson's dissent on this point is fatally flawed for three reasons. First, Justice Danielson states that,

> According to Lead Hill, under the terms of its contract with Ozark, it is obligated to pay a minimum monthly charge to Ozark that results in a total obligation of $2.25 million, an amount that far exceeds the town's annual revenue of approximately $360,000.

This misconstrues Lead Hill's argument. Lead Hill asserts that its total obligation over the 40-year term of the contract would be $2.25 million, not an annual obligation of $2.25 million.

B. Amendment 78

Second, Lead Hill asserts that the contract is "wholly void" because the contract term

---

Second, Justice Danielson states:

> It is irrelevant that the contract included a provision purporting to prohibit Lead Hill from guaranteeing the obligations under the contract with its full faith and credit and designating that the purchase price be paid from revenue generated through the sale of Ozark's water, because Lead Hill is obligated to pay a minimum monthly charge of between $4,687 and $5,540 regardless of whether it generates sufficient revenue from the sale of the water.

Although Justice Danielson states that the provision is "irrelevant," our case law indicates otherwise. We have approved this "irrelevant" provision and held that multiyear purchase contracts for water did not violate article 12, section 4 because the contracts did not pledge the full faith and credit of the town; but rather they pledged the revenues derived from the sale of the water and pledged the revenues of its own waterworks system. *See McGehee v. Williams*, 191 Ark. 643, 87 S.W.2d 46 (1935); *Hink v. Board of Directors of Beaver Water District*, 235 Ark. 107, 357 S.W.2d 271 (1962).

Third, Justice Danielson's position is based upon a hypothetical situation that may occur upon enforcement. His position is not premised on the record before this court. Simply put, Lead Hill asserted below that the contract on its face was void because it was unconstitutional. They did not plead, argue, or meet proof with proof showing that revenues from the sale of water were insufficient to meet the minimum monthly amount agreed to in the contract. Thus, the trial court did not err in granting summary judgment.

Justice Hart's dissenting opinion is flawed as well. Justice Hart states:

> The Arkansas Supreme Court has superintending authority over the inferior courts of this state. Ark. Const. amend. 80. We should exercise this authority, if for no other reason, than to prevent the misuse of an extraordinary writ and the violation of our state constitution. . . . Accordingly, in the case before us, we should not act as though we are fettered by the arguments raised in the parties' briefs.

However, this position is misplaced, our jurisdiction is appellate and we cannot exceed that jurisdiction.

exceeds five years, which is in violation of amendment 78 to the Arkansas Constitution. Ozark responds that the contract at issue does not fall within the parameters of amendment 78.

The circuit court held:

> The five-year limitation for short term financing obligations under Amendment 78 to the Arkansas Constitution is not applicable to the Water Purchase Contract. Therefore, the Town's citation of Amendment 78 is not a valid legal defense to the enforcement of the Water Purchase Contract.

Amendment 78 provides in pertinent part:

> For the purpose of acquiring, constructing, installing or renting real property or tangible personal property having an expected useful life of more than one (1) year, municipalities and counties may incur short-term financing obligations maturing over a period of, or having a term, not to exceed five (5) years.

Ark. Const. Amend. 78, § 2(a).

Further, the amendment defines "short-term financing obligation" as "a debt, a note, an installment purchase agreement, a lease, a lease purchase contract, or any other similar agreement, whether secured or unsecured." *Id* § 2(b)(1). Lead Hill asserts that the circuit court erred because the contract at issue falls within amendment 78 and the terms of the contract exceed the five-year limitation prescribed in our constitution. Ozark responds that the contract for the delivery of potable water to the master meter does not violate amendment 78 because it is not a short-term financing obligation.

Here, the parties entered into a contract to provide potable water to be paid for by revenues derived from its customers. The contract is not a short-term financing obligation as defined by amendment 78. Based on the record before us, Lead Hill has failed to present

unresolved material facts on this issue or that reasonable differing inferences could be drawn from the undisputed facts. Accordingly, based on our standard of review, we affirm the circuit court on this point.

## II. *The Contract Violates Federal Law*

Lead Hill next asserts that the circuit court erred in granting summary judgment because the contract violates 7 U.S.C. § 1926(b) and is therefore void. Lead Hill contends that federal law prohibits a water entity, such as Ozark, from curtailing another entity's ability to repay USDA loans by providing water service in an area where the indebted entity, Lead Hill, is already providing water and therefore the contract is unenforceable. Ozark responds that the statute is not applicable to the contract.

Lead Hill's argument regarding 7 U.S.C. § 1926(b) requires us to interpret the statute. "The first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language." *Potter v. City of Tontitown*, 371 Ark. 200, 209, 264 S.W.3d 473, 481 (2007).

The circuit court held that 7 U.S.C.A. § 1926(b) was not a valid legal defense to enforcement of the contract and granted summary judgment on this point.

7 U.S.C. § 1926(b) provides in pertinent part:

(b) Curtailment or limitation of service prohibited.

The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area

served by the association at the time of the occurrence of such event.

Here, Lead Hill contends that it was indebted to the USDA on three separate loans at the time it entered into the contract. Further, Lead Hill contends that it had to disconnect from its current water supply and use water only from Ozark. In other words, Lead Hill asserts that Ozark violated § 1926(b) because the contract required Lead Hill to disconnect from its current water system and purchase 100% of its water from Ozark and curtailed its ability to repay its USDA loans.

Ozark responds that Lead Hill has misinterpreted the application of 7 U.S.C. § 1926(b) and the noncurtailment statute does not apply to void the contract. Ozark further responds that Lead Hill's waterworks system operated by Lead Hill is financed by the USDA bonds, not the water supply, and the waterworks system has not been impaired or affected.

In *Public Water Supply District No. 3 of Laclede County, Missouri. v. City of Lebanon, Missouri*, the Eighth Circuit Court of Appeals analyzed the applicable statute and explained:

> The key operative provision of § 1926(b) provides that a rural district's service "shall not be curtailed or limited." In this context, the verbs "curtail" and "limit" connote something being taken from the current holder, rather than something being retained by the holder to the exclusion of another. *See The New Shorter Oxford English Dictionary* 575, 1591 (4th ed.1993) (defining "curtail" as "[s]horten in . . . extent or amount; abridge"; defining "limit" as "set bounds to; restrict"); *see also CSL Utils., Inc. v. Jennings Water, Inc.*, 16 F.3d 130, 135 (7th Cir.1993) ("The cases and fragments of legislative history available to us all seem to have in mind curtailment resulting *from substitution* of some third party as a water–supplier for [the rural district]." (emphasis added)). FN3.
> . . .
>
> > FN3. The legislative history is consistent with such a reading. Subsection (b) was added to § 1926 in 1961 "to assist in protecting the territory served by such an association facility against competitive facilities, which might otherwise be developed with the expansion of the boundaries of municipal and other public

bodies into an area served by the rural system." S. Rep. 87–566, 1961 U.S.C.C.A.N. 2243, 2309 (emphasis added).

605 F.3d 511, 516 & n.3 (8th Cir. 2010).

The issue before us is whether the circuit court erred in granting summary judgment regarding Lead Hill's claim that 7 U.S.C. § 1926(b) renders the contract unenforceable. Based on the plain language of 7 U.S.C. § 1926(b) and the record before us, 7 U.S.C.A. § 1926(b) has no application to the case before us. The parties here are not competing for waterworks customers. As Lead Hill acknowledged in its brief to the circuit court, "this is simply [Lead Hill] buying water from . . .[Ozark.]" The statute is designed to prevent competition. There is no competition or curtailment between Lead Hill and Ozark. Accordingly, we hold that the circuit court did not err and affirm on this point.

### III. *Ozark Lacked the Capacity to Enter Into the Contract*

Lead Hill next contends that Ozark lacked the capacity to enter into the contract and that the circuit court erred by granting summary judgment because a factual question remains regarding Ozark's capacity. Lead Hill asserts that the circuit court erred because Ozark did not follow corporate formalities and was not properly formed; therefore, Lead Hill cannot be bound to the contract because any act by Ozark is an ultra vires act and it should not be bound to the contract.

In granting Ozark's motion for summary judgment on this issue, the circuit court held that Lead Hill's "argument that [Ozark] lacked the capacity to enter into the . . . contract is not a valid legal defense to the enforcement of the . . . contract under Arkansas law. No facts supporting the defense of capacity would change the enforceability of the . . . contract as a

matter of law."

With regard to Ozark's ability to enter into the contract, Ark. Code Ann. § 4-35-210(20) & (22) (Supp. 2013) provides in pertinent part:

> A water authority shall have the following powers, together with all powers incidental thereto or necessary to the discharge thereof:
>
> (20) To do and perform all acts and things and have and exercise any power as may be convenient or appropriate to effectuate the purposes for which the water authority is formed;
> . . .
>
> (22) To enter into water contracts for the purchase or sale of water on a wholesale basis on the terms and conditions the board determines are in the best interest of the water authority.

In *Barnhart v. City of Fayetteville*, 321 Ark. 197, 209, 900 S.W.2d 539, 545 (1995), we addressed contracts that may have been formed by ultra vires acts and are unenforceable:

> We have long made a distinction between a contract with a municipality that is ultra vires in the general sense and, because it is wholly outside the authority of the municipality to make such a contract under any circumstances, is void ab initio, *Town of Newport v. Batesville & Brinkley Ry. Co.*, 58 Ark. 270, 24 S.W. 427 (1893), and a contract that is ultra vires in the limited sense because the power to contract was merely exercised irregularly and thus can be ratified. *Blount v. Baker*, 177 Ark. 1162, 9 S.W.2d 802 (1928).

Further, in *Keith v. City of Cave Springs*, 233 Ark. 363, 374–75, 344 S.W.2d 591, 597 (1961), we explained that a party cannot be permitted to accept the benefits under the contract and at the same time avoid its obligation under such agreement:

> The evidence is undisputed that the City of Cave Springs has for the past ten years diligently fulfilled an implied covenant to purchase water for its residential and industrial consumers and the express covenant to pay for the water purchased. See *Mooney v. Gantt*, 219 Ark. 485, 243 S.W.2d 9. Therefore, appellants cannot be permitted to accept the benefits under the contract and at the same time avoid their obligation under such agreement. *Williams Mfg. Co. v. Strasberg*, 229 Ark. 321, 314

S.W.2d 500.

Here, despite whether Ozark adhered to the proper corporate formalities, the record demonstrates that Ozark has received articles of incorporation and maintained the statutory authority to enter into the contract.  Pursuant to Ark. Code Ann. § 4–35–210(20) and (22) and *Barnhart*, Ozark's acts were not ultra vires.  Finally, based on our holding in *Barnhart*, even if Ozark did proceed irregularly, Ozark maintained the authority to enter into the contract. Therefore, we do not find error and affirm the circuit court on this point.

IV. *The Contract is Unenforceable Under Several Contract Principles*

For its final point on appeal, Lead Hill contends that its performance under the contract is excused and the contract fails based on several contract principles: impossibility of performance, impracticability of performance, supervening frustration, unconscionability, and lack of mutuality.

A. Excuse of Performance: Impossibility, Impracticability and Supervening Frustration

Lead Hill first asserts that its performance under the contract is excused by the impossibility of performance, impracticability of performance, and supervening frustration. Lead Hill asserts this because "numerous statutes and constitutional provisions . . . will be violated" if the contract is enforced. Lead Hill further asserts that the performance of the contract has become impractical and frustrated because its customer base was decreased by fifty percent.

Ozark responds that the doctrines are not applicable because Lead Hill's assertions are not based on any factual evidence but on hearsay arguments of counsel concerning the

SLIP OPINION

number of customers that buy water. Further, Ozark responds that Lead Hill has not alleged a change in circumstance that was a basic assumption of the contract and has waived any right to argue a change in circumstance because Lead Hill failed to avail itself of the procedural mechanisms and remedies in the contract.

In its June 11, 2014 order granting summary judgment to Ozark, the circuit court held that "[n]one of the other defenses raised by the Town in opposing the Motion for Summary Judgment constitutes a valid legal defense to the enforcement of the Water Purchase Contract. No facts supporting such defenses would change the enforceability of the Water Purchase Contract as a matter of law."

The Restatement (Second) of Contracts provides in pertinent part:

§ 261 Discharge by Supervening Impracticability

Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

§ 265 Discharge by Supervening Frustration

Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

§ 266 Existing Impracticability or Frustration

(1) Where, at the time a contract is made, a parties performance under it is impracticable without his fault because of a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty to render that performance arises, unless the language or circumstances indicate the contrary.

15

(2) Where, at the time a contract is made, a party's principal purpose is substantially frustrated without his fault by a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty of that party to render performance arises, unless the language or circumstances indicate the contrary.

Restatement (Second) of Contracts §§ 261, 265 & 266 (1981).

Here, the crux of Lead Hill's argument is that the circuit court erred in granting summary judgment on its defenses to performing the contract due to the loss of customers and that the contract is now impracticable, impossible, and frustrated. Based on the record before us, Lead Hill has failed to demonstrate that the circuit court erred in granting summary judgment on this point. We do not find error and affirm.

## B. Unconscionability

Lead Hill next asserts that there are "numerous" provisions in the contract and that the contract as a whole is unconscionable. However, Lead Hill's primary complaint is that Article B, section 2 is unconscionable. That section of the contract provides in pertinent part:

> Minimum Charge. Purchaser shall be invoiced each month for its "Minimum Charge" which initially shall be based upon the average amount of water pumped per day in 2008 (Lead Hill=56,038 gpd). The "Minimum Monthly Charge" shall be between $4,687.00 and $5,540.00 dependant on the wholesale water rate described in Article B-3 at the commencement of this Agreement. The Minimum Charge is calculated by the Seller to be a rate whose sum is equal to the Purchaser's pro-rated share of the debt service, debt service reserve deposit requirements, depreciating fund deposit requirements, operation and maintenance (O & M) costs and administrative costs associated with the construction and operation of the System. Payment of the Minimum Charge allows the Purchaser to consume, without further charge, the number of gallons of water determined by dividing the Minimum Charge by the Wholesale Water Rate, as defined herein.

SLIP OPINION

> Purchaser covenants and agrees to pay the Minimum Charge on a Monthly Basis, as invoiced by Seller, regardless of whether Purchaser actually purchases or takes water from Seller. To the extent that Purchaser's consumption of water exceeds the amount determined by dividing the Minimum Charge by the Wholesale Water Rate, Purchases will be invoiced by Seller monthly for the excess based on the prevailing Wholesale Water Rate.

Lead Hill contends that this provision is unconscionable because this provision and the contract terms commit Lead Hill to a perpetual contract and require a minimum monthly charge even if Lead Hill never uses the water.

The circuit court granted Ozark summary judgment on this issue and held, "None of the other defenses raised by the Town in opposing the Motion for Summary Judgment constitutes a valid legal defense to the enforcement of the Water Purchase Contract. No facts supporting such defenses would change the enforceability of the Water Purchase Contract as a matter of law."

In *Gulfco of Louisiana, Inc. v. Brantley*, 2013 Ark. 367, at 9, 430 S.W.3d 7, 13, we explained unconscionability:

> Our standards regarding unconscionability are as follows. An act is unconscionable if it affronts the sense of justice, decency, and reasonableness. *Baptist Health v. Murphy*, 2010 Ark. 358, 373 S.W.3d 269. We have stated that in assessing whether a particular contractual provision is unconscionable, the courts review the totality of the circumstances surrounding the negotiation and execution of the contract. *Jordan v. Diamond Equip. & Supply Co.*, 362 Ark. 142, 207 S.W.3d 525 (2005). Two important considerations are whether there is a gross inequality of bargaining power between the parties and whether the aggrieved party was made aware of and comprehended the provision in question. *Id*. We also observe that another factor which may contribute to a finding of unconscionability is a belief by the stronger party that there is no reasonable probability that the weaker party will fully perform the contract. Restatement (Second) of Contracts § 208.

We also addressed unconscionability in *LegalZoom.com, Inc. v. McIllwain*, 2013 Ark.

370, at 6–7, 429 S.W.3d 261, 264, and explained,

> While "unconscionability" is not precisely defined in the law, one of the earliest applications of the doctrine described an unconscionable contract as one that "no man in his senses and not under delusion would make on the one hand, and . . . no honest and fair man would accept on the other." James J. White & Robert S. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 4–1 (3d ed.1988) (quoting *Earl of Chesterfield v. Janssen* (1750) 728 Eng. Rep. 82, 100 (K.B.). In essence, to be unconscionable, a contract must oppress one party and actuate the sharp practices of the other.

Here, based on the record before us, the record does not support Lead Hill's argument for reversal. Accordingly, we agree with the circuit court and affirm on this point.

### C. Lack of Mutuality and Illusory Provisions

Lead Hill also contends that the contract fails for lack of mutuality based on illusory provisions in the contract. Lead Hill cites to Article B, section 4(A) and asserts that a reallocation must be reviewed and approved by Ozark, which constitutes an illusory promise and lacks mutuality because any request must be approved by Ozark. Further, Lead Hill again relies on its allegations of a decrease in its customers from South Lead Hill. Ozark responds that Lead Hill has waived any argument that the contract contains illusory provisions resulting in lack of mutuality because consideration has been conferred. Ozark also responds that Lead Hill's argument regarding lack of mutuality is based on hearsay argument by counsel that is not supported by the record before the court.

Article B, section 4(A) of the contract provides:

Adjustment to Minimum Charge or Wholesale Water Rate.
During the term of this Agreement, Seller may adjust the Minimum Charge or the Wholesale Water Rate, without the consent or the approval of the Purchaser, in the following ways or under the following circumstances:

A.    In the event that during the courts of this Agreement the number of retail customers of any purchaser obtaining water from Seller should substantially decrease or increase, then either on request of any purchaser or on its own initiative, the Seller shall perform a reallocation of the Minimum Charge to all purchasers receiving water from Seller so as to relieve undue participant burden associated with the decreasing or increasing customer base. A reallocation shall be considered based upon the request of any purchaser made in writing to the Seller which cites the reasons and rationale for the requested reallocation. Any reallocation must be reviewed and approved by the Board of Directors of Seller before becoming effective. Seller may perform and implement such reallocations from time to time without the necessity of obtaining written consent or approval from the Purchaser, but under no circumstances will reallocations be performed more often than two times in any calendar year.

In *Jordan v. Diamond Equipment & Supply Co.*, 362 Ark. 142, 153, 207 S.W.3d 525, 533 (2005), we explained the mutuality of obligations:

We have recognized that mutuality of contract means that an obligation must rest on each party to do or permit to be done something in consideration of the act or promise of the other; thus, neither party is bound unless both are bound. *The Money Place v. Barnes*, 349 Ark. 411, 78 S.W.3d 714 (2002); *Showmethemoney Check Cashers, Inc. v. Williams*, 342 Ark. 112, 27 S.W.3d 361 (2000). . . . Mutuality of obligation involves the exchange of promises, and mutuality of obligations becomes "a nonissue" when performance is given.

Here, the record demonstrates that Lead Hill agreed to pay Ozark to provide potable water to Lead Hill's master meter in exchange for payment and the parties adhered to the contract for ten months. Additionally, based on the record before us, Lead Hill has not demonstrated the existence of a material fact at issue regarding its loss of customers or that reasonable differing inferences could be drawn from the undisputed facts. Therefore, we cannot say the circuit court erred in granting summary judgment on this point, and we affirm its decision.

SLIP OPINION

Affirmed.

DANIELSON and HART, JJ., dissent.

**PAUL E. DANIELSON, Justice, dissenting.** Because I believe there is a question of material fact at issue, I respectfully dissent from the majority's decision affirming the circuit court's grant of summary judgment.

Appellants, the Town of Lead Hill and its various town officials (Lead Hill), argue on appeal that the circuit court erred in finding that the Wholesale Water Purchase Contract entered into with Appellee Ozark Mountain Regional Public Water Authority of the State of Arkansas (Ozark) was a valid and enforceable contract, thereby granting Ozark's motion for summary judgment and issuing a writ of mandamus compelling the mayor and aldermen of Lead Hill to satisfy the obligations under the contract. Lead Hill argues, in part, that the circuit court erred because there is a question of fact as to whether the contract violates article 12, section 4, of the Arkansas Constitution. I find this argument persuasive.

The circuit court, in granting Ozark's motion for summary judgment, concluded that none of the defenses to the enforcement of the contract raised by Lead Hill constituted valid legal defenses to the enforcement of the water-purchase contract. According to the circuit court, there were no genuine issues of material fact, and Ozark was thus entitled to judgment as a matter of law. Although the circuit court did not specifically address Lead Hill's article 12, section 4 argument, it clearly rejected each of the contract defenses advanced by Lead Hill.

In arguing that the court erred in granting summary judgment, Lead Hill asserts that its contract with Ozark is void and unenforceable because article 12, section 4, of the Arkansas

Constitution prohibits a city from entering into a contract that is in excess of the city's annual revenue. According to Lead Hill, under the terms of its contract with Ozark, it is obligated to pay a minimum monthly charge to Ozark that results in a total obligation of $2.25 million, an amount that far exceeds the town's annual revenue of approximately $360,000. Thus, Lead Hill argues that under article 12, section 4, and this court's case law interpreting that provision, it is clear that its contract with Ozark is void and unenforceable.

Article 12, section 4 provides in relevant part as follows:

> The fiscal affairs of counties, cities and incorporated towns shall be conducted on a sound financial basis, and no county court or levying board or agent of any county shall make or authorize any contract or make any allowance for any purpose whatsoever in excess of the revenue from all sources for the fiscal year in which said contract or allowance is made.

This provision was added to article 12, section 4 by amendment 10, which was approved by the people of Arkansas in the 1924 general election and declared adopted by a special supreme court in *Brickhouse v. Hill*, 167 Ark. 513, 268 S.W. 865 (1925). The thrust of amendment 10 was to limit the fiscal affairs of counties, cities, and towns. *Purvis v. City of Little Rock*, 282 Ark. 102, 129-A, 669 S.W.2d 900 (1984) (supplemental opinion on denial of rehearing).

It is quite clear from the plain language of article 12, section 4, that a town such as Lead Hill may not authorize a contract that exceeds the town's annual revenue. It is irrelevant that the contract included a provision purporting to prohibit Lead Hill from guaranteeing the obligations under the contract with its full faith and credit and designating that the purchase price be paid from revenue generated through the sale of Ozark's water, because Lead Hill is obligated to pay a minimum monthly charge of between $4,687 and

$5,540 regardless of whether it generates sufficient revenue from the sale of the water. Moreover, there is no provision allowing Lead Hill to terminate the contract if, for instance, the revenue it generates from the sale of Ozark's water is insufficient to cover the minimum monthly amount owed to Ozark.

On appellate review, this court must determine whether summary judgment was proper based on whether the evidence presented by the moving party left a material question of fact unanswered. *Ryder v. State Farm Mut. Auto. Ins. Co.*, 371 Ark. 508, 268 S.W.3d 298 (2007). Here, it is obvious that a material question of fact remains because the contract terms are in conflict as to whether Lead Hill must pay the minimum monthly charge to Ozark solely out of revenue generated from the sale of the water or whether the contract implicates article 12, section 4, by requiring the town to extend its full faith and credit to satisfy its contractual obligation to Ozark. For this reason, I believe it was improper for the circuit court to grant summary judgment in favor of Ozark, and I respectfully dissent.

**JOSEPHINE LINKER HART, Justice, dissenting.** I am troubled by the circuit court's order:

> The Court hereby declares that the plain and unambiguous terms of the Water Purchase Contract are enforceable against the Town of Lead Hill, and hereby issue a writ of mandamus compelling the Mayor and Aldermen of the Town of Lead Hill to satisfy their obligations under the Water Purchase Contract.

I believe it must be reversed. The Arkansas Supreme Court has superintending authority over the inferior courts of this state. Ark. Const. amend. 80. We should exercise this authority, if for no other reason, than to prevent the misuse of an extraordinary writ and the violation of our state constitution.

We have used this superintending authority to remove judges from the bench, *Arkansas Judicial Discipline Committee v. Proctor*, 2010 Ark. 38, 360 S.W.3d 61; appoint special judges to take control over a circuit court's docket, *In re Phillips County*, 2013 Ark. 55; draft all of the rules of civil and criminal procedure; and sit as the final approving authority over how a judicial district will operate. Accordingly, in the case before us, we should not act as though we are fettered by the arguments raised in the parties' briefs.

Lost somewhere in the circuit court's order, the parties' briefs, and the majority's decision is the fact that the controversy between the parties is simply the breach of a commercial contract. Contract cases always have contract remedies. So, there is an adequate remedy at law. By seeking the combination of declaratory judgment and mandamus, Ozark has sidestepped the issue of which side committed the first material breach—be it Ozark for refusing to adjust the minimum monthly charge in accordance with Article B. paragraph 4A of the contract or the repudiation of the contract by Lead Hill. As with any contract, even contracts that are unquestionably valid when they are executed, issues can arise that can excuse performance. This point is pivotal.

For a writ of mandamus to compel a public corporation to perform its duties towards its creditors, there must first be a judgment to establish the validity and amount of the debt. *School District No. 3 v. Bodenhamer*, 43 Ark. 140 (1884). Our declaratory judgment statute does not provide for the rendering of a monetary judgment. *See* Ark. Code Ann. §§16-111-101-111 (Repl. 2006). In fact, the general assembly has declared that the purpose of an action under this statute is only to "settle and to afford relief from uncertainty and insecurity with

respect to rights, status, and other legal relations." Ark. Code Ann. §16-111-102(b). When it is apparent that the stated purpose will not be accomplished, the declaratory judgment statute expressly empowers a circuit court to refuse to enter a judgment or decree when it "would not terminate the uncertainty or controversy giving rise to the proceeding." Ark. Code Ann. §16-111-108. As noted previously, whether the wholesale water purchase contract is valid as written is but one aspect of the controversy.[2] The issue of whether there were valid defenses to *enforcement* of the contract had to be litigated before a valid monetary judgment could issue.[3] It is therefore untenable that the circuit court would grant an extraordinary writ to enforce payment of money pursuant to a commercial sales contract.

Hitherto, our law on the propriety of granting a writ of mandamus has been well settled. As this court recently stated in *Lonoke County. v. City of Lonoke*:

> A "writ of mandamus" is "an order of the circuit court granted upon the petition of an aggrieved party or the state when the public interest is affected, commanding an

---

[2]In determining if there was a valid contract, the circuit court was only being asked to determine if the essential elements of a contract were present: (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligations. *Tyson Foods, Inc. v. Archer*, 356 Ark. 136, 147 S.W.3d 681 (2004).

[3]The circuit court's order is clearly wrong when it states:

> None of the other defenses raised by [Lead Hill] in opposing the Motion for Summary Judgment constitutes a valid defense to the enforcement of the Water Purchase Contract. No facts supporting such defenses would change the enforceability of the Water Purchase Contract as a matter of law.

Lead Hill clearly asserted that Ozark had committed the first material breach of the contract, which would be an absolute defense to enforcement. At the very least, this is a factual dispute that should have defeated summary judgment.

executive, judicial, or ministerial officer to perform an act or omit to do an act, the performance or omission of which is enjoined by law." . . . The writ is issued where (1) the duty to be compelled is ministerial and not discretionary, (2) the petitioner has shown a clear and certain right to the relief sought, and (3) the petitioner lacks any other adequate remedy.

2013 Ark. 465, at 2, 430 S.W.3d 669, 670 (citations omitted). The existence of another "adequate remedy" has been treated as subject matter jurisdiction. *See, e.g.*, *Hanley v. Ark. State Claims Comm'n*, 333 Ark. 159, 970 S.W.2d 198 (1998). Moreover, it is the burden of the party applying for the writ—Ozark—to show the absence of any specific legal remedy. *Goings v. Mills*, 1 Ark. 11 (1837). I have found nothing in the record that shows that Ozark has carried this burden. This court should therefore adhere to our long-established practice of raising issues of subject-matter jurisdiction on our own motion; it is settled law that subject-matter jurisdiction, if lacking, cannot be induced simply because there is no objection. *Love v. Smackover School Dist.*, 322 Ark. 1907 S.W.2d 136 (1995) (Brown, J., dissenting) (citing *J.W. Reynolds Lumber Co. v. Smackover State Bank*, 310 Ark. 342, 836 S.W.2d 853 (1992)).

The writ of mandamus issued by the circuit court compels the elected officials in Lead Hill, including the mayor and five aldermen, who were sued individually, as well as in their representative capacities, to pay contract damages. This is a clear abuse of mandamus. This court is now saying that a dispute involving any of the thousands of purchase contracts entered into by the state and local governments in Arkansas can subject our elected officials to personal liability if the government officials decide that there is a reason not to pay.

More troubling still is the fact that the circuit court order imposes no limitation on

25

the source of the funds to pay the minimum monthly charge for the water. Even thought the contract by its express terms in article C, paragraph 19 limits the source of the funds "solely [to] revenues generated by the sale of Purchaser's water to its customers." A long-term water-sales contract, such as the one before us, can pass state constitutional muster only if it contains a clause that limits the source of the funds to pay the minimum monthly charge to revenues generated by the waterworks. *McGehee v. Williams*, 191 Ark. 643, 87 S.W.2d 46 (1935). However, as noted, the circuit court's order contains no such restriction. The result is that the circuit court's order gives Ozark much more than it contracted for and backs it up with the contempt powers wielded by the circuit court.

Looming in the background, though I admit not squarely before this court, is the threat that failure to pay these contract damages will result in these public officials being jailed for contempt. This is tantamount to imprisoning these officials for a debt, something clearly proscribed by our state constitution. Article 2, § 16 succinctly states, "No person shall be imprisoned for debt in any civil action, on mesne or final process, unless in cases of fraud." This court has previously rejected the idea that contract cases could be enforced with jail time. In *State v. Riggs*, 305 Ark. 217, 807 S.W.2d 32 (1991), this court struck down as unconstitutional Arkansas Code Annotated section 5-37-525 (Supp. 1989), a statute that sought to criminalize a contractor's or subcontractor's knowing refusal to pay for materials. Invoking appellate practice and procedure is not a justification for retreating from this holding.

I respectfully dissent.

*Taylor & Taylor Law Firm, P.A.*, by: *Andrew M. Taylor* and *Tasha C. Taylor*, for appellants.
*Martin Law Firm, P.A.*, by: *Thomas A. Martin*; and
*Friday, Eldredge & Clark, LLP*, by: R. Christopher Lawson, for appellee.